First case on the calendar, NLRB versus Dawn Trucking. May I proceed? Thank you. Good morning. May it please the court. My name is Richard Ziskin. I am counsel to Dawn Trucking. With respect to the issues raised on this appeal, Dawn Trucking maintains that the record evidence did not support the National Labor Relations Board findings on several issues. First, the National Labor Relations Board determined that Dawn Trucking did not shut down its entire business operation. However- How do you reconcile that with the fact that Mr. Burry continued to drive trucks after Dawn allegedly fired all of its drivers? Right. The judge's conclusion was that Mr. Burry continued to drive one truck for the remainder of November of 2015 as he was winding down his operation. The stipulation was that as of the date of the election which the union was successful in, that Dawn Trucking from that point forward no longer dispatched any of its drivers. And that was throughout the entire duration. So with regard to that- What is the error in finding that therefore there wasn't a permanent shutdown? I mean, I'm not sure I'm following you. The company's argument was that there was a permanent shutdown. But there was an employee who was continuing to work. So as a matter of finding whether that is or is not a permanent shutdown, how could we say that the court erred or the board erred in finding that no, it wasn't? In Textile Workers versus Darlington Manufacturing Corp, the United States Supreme Court stated that Darlington was permitted to wind down its operations and that it was still a lawful closing. Again, I would acknowledge that the words and actions by Dawn Trucking were not as they should have been. Nevertheless, the intent was to shut down the operation. And that's what actually happened. If the words and the intent are not what they should have been, why was the NLRB incorrect? Why shouldn't we rely on the NLRB under the standard of review that is before us? I think it's a very bad optic for my client to state that if the union wins the election, I'm going to shut down the operation. It looks bad, it sounds bad, and it would be unlawful if he actually continued the operation. He didn't continue the operation. That's the whole point, is that the trucks were sold, no drivers were dispatched after the date of the election, save Mr. Bury, who worked on several occasions during the month of November while the company was winding down. But there were other concerns. Wasn't there a January and February 2016 reinstatement offer to certain drivers on the condition that they reject the union? Right, so- And that was one of the factors that informed the board's decision, right? Yes, I would concede that there were two offers of reinstatement made in February of 2016 and August of 2016. And really what the company was trying to do was, I guess, either double down or hedge its bets. It knew that it wanted it shut down. I don't think that this individual consulted any decisions before he, as he made these determinations, but he understood that if he made an offer of reinstatement to the drivers and they rejected it, he wouldn't actually have to prove that he shut down his operation. The reinstatement offers could pass, the drivers could reject them as they did, and he wouldn't have to go through the process of proving that he shut down his operation. Let's read the text message. The text message of February 16th says, this is the text message that was sent to three drivers. I want to start work again at $27 per hour, no union rates, no benefits, no prevailing wage. Reply by tomorrow if interested, 2-17-16 by 4 PM. And it seems to suggest that reinstatement would be conditioned on rejecting the union. Now, I understand that there may be different ways of interpreting that text message, as you have suggested. But why isn't the board's reading permissible? Again, I would acknowledge that the text message is not awfully worded, but the text message doesn't state no union. It states no union rates, no benefits. And those are the terms and conditions of employment that the drivers were previously operating under. All my client did was inartfully state that he was going to maintain the status quo of what they previously enjoyed. But that's the point, that that shows that it wasn't a shutdown. Again- Again, I'm not saying you don't have an argument that, no, you should view it as a shutdown. But if it's a question of fact, whether this was intended as a shutdown or not, we would defer to the board. You have to show that there's no way on this record that the board could have concluded that it was other than a shutdown, right? I would agree, yes, Your Honor. And again, the argument is not a sophisticated company, not a sophisticated individual. He wants to shut down his business operation. That's in fact what does happen. And he really doesn't want to be in the position where he's in today, but he is. And the whole point was, the business was shut down, and he knew that if he offered them the driver's reinstatement, and they rejected the offers of reinstatement, he wouldn't have to worry about a potential back pay award. He felt, my client felt like he was pinned against the wall, that he was going to be forced to reopen his business, forced to pay back pay. And it's going to be significant for nine months if he's forced to pay back pay. So the way to avoid that if the NLRB and the region wasn't going to accept his argument that he shut down was to say, okay, fine, I'll offer reinstatement, I'll cut off my back pay. The drivers know that I'm not going to operate, which is why they rejected the offer, and this is where we're at. He didn't want to continue his business. He did a very poor job of getting that across. This sounds like something we hear all the time, and that is that he got his good legal advice too late. You know what I mean? I mean, you're kind of telling us how, if he had done it right, he could have done it and there would have been no problem, but the question is, did he do it right? I agree. I wasn't counsel at the time. I somehow guessed, yes. He didn't do it the way he should have done it. I would have made every recommendation slightly different in the way everything was carried out. But again, his intent, and what actually happened was to shut down the business. That's what he wanted, that's what ultimately occurred. The trucks were sold, there's no allegation that there was a runaway shop that he went somewhere else. There's no allegation that there's some sort of alter ego double breasted operation. There's no allegation that he hired new drivers, that the old drivers actually came back, that he took on additional work. He wanted out, and he did a really poor job of conveying that. Thank you. Thank you. May it please the court. Good morning. My name is Jeff Byrd. I'm here on behalf of the National Labor Relations Board. Your honors, as the record shows, within hours of the union or the employees' drivers unanimously electing the union, Mr. Burry made it quite clear that he was done, that he was discharging the drivers. In fact, he never dispatched work to them again. However, as the discussion has indicated already this morning, he did anything but engage in a total cessation of his business, which is the language that is used in Darlington. And it's a complete cessation, a complete closure. He indicated immediately before the election that he didn't want to be a union company. But in his notice to employees that he provided with a paycheck a few days earlier, he didn't say anything about retiring. The board discredited his testimony that he had an intent to retire that existed long before the union came on the scene. Immediately after the election, when he was represented by council, within several weeks his council reached out to the union just to express some uncertainty about what was going on at the property. And of course there were the reinstatement offers, as your honor pointed out, there was actually reinstatement offers in January as well as February. There was the February text, but in January there was a phone conversation in which Mr. Burry made clear that he wished to reinstate those who were not the terrorists, which the board reasonably interpreted as the individual drivers who had led the organizing campaign. He made the reinstatement offer in February, as we discussed it. There is the February 16th text message. Yes, and that is the reinstatement offer, the actual offer that went out to multiple employees. But there was also this conversation earlier in January that also contributed to painting the complete picture that he was not shutting down. That what he wanted was he wanted to continue operations as a non-union company. So he had that conversation in January, there was the text message in February, whether or not it was inartfully worded. At the time he was represented by council, not this council, but by council. He understood he had obligations under the National Labor Relations Act that arose when his employees sought to exercise their section seven rights to engage in collective bargaining. He had made clear that he didn't think he could obtain union work and he didn't want the union there. And it was against that backdrop that the board read this text message that in no uncertain terms said no union rates, no union wages, no benefits. It was not limited in any temporal sense to suggest that that condition would only exist until there was collective bargaining. There was never any collective bargaining up until that point. As I indicated, as the record shows, the drivers were immediately discharged and so the status of negotiations really never took off at that point. So unlike the cases cited, or a case cited by the company, this wasn't a situation in which the surrounding circumstances suggested that this was just a conveyance of an offer of how they could come back pending further negotiations. This was a take it or leave it offer. Because it was conditioned on the rejection of the union, unlawfully so, it did not constitute a valid offer of reinstatement as the board found. If this were a case of a lockout, then it would be a different case, wouldn't it? Certainly would, yes, your honor. And of course, the lockout is the alternative argument that while it cannot be reconciled with the idea of a total closure, we have addressed in our brief, lockouts carry with them certain obligations. It is, of course, permissible for an employer under American Shipping, the Supreme Court's decision that American Shipping has developed over the decades, that employers, excuse me, have the right to bring economic pressure to bear on their employees in support of their bargaining position. Or they can engage in a lockout and withhold work from their employees if they believe that there's a pending work stoppage that they need to account for. There is a complete absence of anything in the record suggesting that either condition existed here. Mr. Burry testified before the Administrative Law Judge that he was concerned that there could be a work stoppage. A work stoppage is always possible. But there was no suggestion by the employees or the union that that was imminent or ever likely to occur. So there was no reasonable basis to believe that there was actually a work stoppage that the lockout would avert. Likewise, in order to bring economic pressure to bear, by locking out employees, it certainly interferes with employees' section seven rights. But the Supreme Court found that that interference is slight because the employees have the ability to end the lockout or to avert the lockout that may be coming, and that is all conditioned on the fundamental principle that the employer has furnished the union and or the employees with clear notice of what they must do in order to avert or end the lockout. And the case law is quite clear that this is not just a tool that can be pulled out at whim to lock out employees. But notice must be given of this, the typical or prototypical example is when there's been bargaining proposals that have gone back and forth. And the employer says, here's my final offer. After good faith bargaining, here is what you, the union, and you, the employees, must do in order to avoid this lockout. And we just simply don't have any type of facts that would support that type of analysis here. So that addresses the discharge allegations. It addresses, I believe I've addressed, although I'm happy to answer more questions, on the allegation that the reinstatement offers were unlawfully conditioned on the rejection of the union. And then there is also the 8A5 violation, refusal to bargain in good faith by engaging in unlawful direct dealing with the drivers. And the direct dealing came in the form of this February text message. Mr. Burry communicated directly with the represented employees about the terms and conditions of their potential reinstatement. He didn't bring this to the, he didn't notify the union of this, either before or at the same time as this was communicated. This is a rather straightforward, in my humble opinion, showing of a direct dealing violation. I'm happy to answer any additional questions, but I also don't want to waste the court's time. Thank you. Thank you very much. I have two minutes. If there's any questions, I'm happy to answer them. Again, willing to acknowledge that Dawn Trucking and the principal of Dawn Trucking, Mr. Burry, was a poor communicator. The only issue was, is that he was intent on shutting down his business. Whether it was because of the union, his health, or otherwise, he has the legal right to shut down. Everything since that point indicates that he has shut down. And yet, the NLRB's trying to put him in a position where he's got to pay back pay to drivers when no work was taken on. Thank you. Thank you both for your arguments. The court will reserve decision.